



UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA-EASTERN DIVISION

| | |
|---|---|
| DEGENE RAPHEL BELL,<br><br>                 Petitioner,<br><br>    v.<br><br>LARRY E. SCRIBNER,<br><br>                 Respondent. | CV ED 07-1177-FMC (SH)<br><br>ORDER ADOPTING THE REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE |

Pursuant to 28 U.S.C. Section 636(b)(1)(C), the Court has reviewed the Petition, all of the records and files herein and the attached Report and Recommendation of the United States Magistrate Judge, and has made a de novo determination of the Report and Recommendation. The Court concurs with and adopts the conclusions of the Magistrate Judge.

IT IS ORDERED that the Petition filed herein is dismissed with prejudice.

1    IT IS FURTHER ORDERED that the Clerk shall serve copies of this Order,

2    the Magistrate Judge's Report and Recommendation and the Judgment herein by

3    the United States mail on petitioner and counsel for respondent.

4        LET JUDGMENT BE ENTERED ACCORDINGLY.

5    DATED: *Jan. 28, 2008*

6

7

8                                    *Florence-Marie Cooper*

9                                    FLORENCE-MARIE COOPER
                                     UNITED STATES DISTRICT JUDGE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FILED
CLERK, U.S. DISTRICT COURT

JAN 2 2008

CENTRAL DISTRICT OF CALIFORNIA
BY                                    DEPUTY

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### EASTERN DIVISION

|  |  |
|---|---|
| DEGENE RAPHEL BELL,<br><br>                    Petitioner,<br><br>        v.<br><br>LARRY E. SCRIBNER,<br><br>                    Respondent. | No. EDCV 07-1177-FMC (SH)<br><br>REPORT AND RECOMMENDATION OF<br>UNITED STATES MAGISTRATE JUDGE |

This Report and Recommendation is submitted to the Honorable Florence-Marie Cooper, United States District Judge, pursuant to 28 U.S.C. § 636 and General Order 01-13 of the United States District Court for the Central District of California.  For the reasons stated below, the petition for a writ of habeas corpus should be denied.

## I.  PROCEEDINGS

Petitioner, a prisoner in the custody of the California Department of Corrections, challenges a conviction in California Superior Court, Riverside County (Case No. RIF

1

DOCKETED ON CM

JAN 2 2008

BY          056

(15)

1  113411).

2  On September 14, 2007, petitioner filed a Petition for Writ of Habeas Corpus by a

3  Person in State Custody ("Petition") herein.  On November 6, 2007, respondent filed an

4  Answer to the Petition ("Answer"), accompanied by a supporting Memorandum of

5  Points and Authorities.  On December 5, 2007, petitioner filed a Traverse to the Answer

6  ("Traverse").

7  Thus, this matter now is ready for decision.

9  ## II.  PROCEDURAL HISTORY

10  On October 20, 2004, a Riverside County Superior Court jury found petitioner

11  guilty of eleven counts of residential burglary (Counts 1, 3, 4, 6, 7, 8, 9, 11, 12, 13, and

12  16), one count of grand theft of a firearm (Count 2), one count of being a felon in

13  possession of a firearm (Count 5), and one count of unlawfully taking a vehicle (Count

14  19).  (2 Clerk's Transcript ["CT"] 515-33; 3 Reporter's Transcript ["RT"] 831-38).[1]  In a

15  bifurcated bench trial, after petitioner waived his right to a jury, the trial court found true

16  the special allegations that petitioner had suffered three prior prison convictions, one

17  prior serious felony conviction, and one prior strike conviction.  (3 CT 634; 3 RT 871-

18  73).  On December 1, 2004, the trial court sentenced petitioner to state prison for forty-

19  five years and four months.[2]  (3 CT 650-52; 3 RT 900-03).

21  [1]      The jury found petitioner not guilty of one count of residential burglary

22  (Count 14) and one count of grand theft of a firearm (Count 15).  (2 CT 527-28; 3 RT 836).  The jury was unable to reach a verdict on two counts of residential burglary (Counts 10 and 17) and one count of grand theft of a firearm (Count 18).  (2 CT 514,

23  559; 3 RT 828).  A mistrial was declare on these counts.  (2 CT 561; 3 RT 838).

24  [2]      Petitioner's sentence consisted of the following: four years, doubled due to

25  the prior strike conviction, for Count 1; a stayed term of eight months, doubled, for Count 2; a consecutive term of sixteen months, doubled, for Count 3; a consecutive term of sixteen months, doubled, for Count 4; a consecutive term of eight months, doubled,

26  for Count 5; a consecutive term of sixteen months, doubled, for Count 6; a consecutive term of sixteen months, doubled, for Count 7; a consecutive term of sixteen months,

27  doubled, for Count 8; a consecutive term of sixteen months, doubled, for Count 9; a consecutive term of sixteen months, doubled, for Count 11; a consecutive term of sixteen

28  (continued...)

2

Petitioner appealed his convictions to the California Court of Appeal, wherein he raised inter alia the same claim as the claim alleged in the Petition herein. (Lodgment No. 7). In an unpublished opinion issued on May 5, 2006, the California Court of Appeal modified the judgment to stay the sentence on Count 19, and affirmed the judgment in all other respects. (Lodgment No. 10).

Petitioner then filed a petition for review in the California Supreme Court, alleging the same claim as the claim alleged in the Petition herein. (Lodgment No. 12). On July 19, 2006, the California Supreme Court summarily denied the petition for review without citation of authority. (Lodgment No. 13).

The instant Petition followed.

## III.  PETITIONER'S CLAIM

The sole claim being alleged by petitioner is that his rights under the Fifth and Fourteenth Amendments were violated when the trial court admitted his coerced and involuntary confession. (Petition at 5).

## IV.  STANDARD OF REVIEW

The standard of review applicable to petitioner's claims herein is set forth in 28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"):

"An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the

---

[2] (...continued)
months, doubled, for Count 12; a consecutive term of sixteen months, doubled, for Count 13; a consecutive term of sixteen months, doubled, for Count 16; a consecutive term of eight months, doubled, for Count 19; a consecutive term of five years for the prior serious felony conviction; and consecutive one-year terms for each of the prior prison convictions. (3 CT 650-52; 3 RT 900-03).

1   adjudication of the claim--(1) resulted in a decision that was contrary to, or

2   involved an unreasonable application of, clearly established Federal law, as

3   determined by the Supreme Court of the United States; or (2) resulted in a decision

4   that was based on an unreasonable determination of the facts in light of the

5   evidence presented in the State court proceedings."

6

7   Moreover, a state court factual determination must be presumed correct unless

8   rebutted by clear and convincing evidence.  See 28 U.S.C. § 2254(e)(1)(as amended).

9   Under the AEDPA, the term "clearly established Federal law" means "the

10  governing legal principle or principles set forth by the Supreme Court at the time the

11  state court renders its decision." Lockyer v. Andrade, 538 U.S. 63, 71-72, 123 S.Ct.

12  1166, 155 L.Ed.2d 144 (2003); see also Williams v. Taylor, 529 U.S. 362, 412, 120 S.Ct.

13  1495, 146 L.Ed.2d 389 (2000) ("clearly established Federal law" consists of holdings,

14  not dicta, of Supreme Court decisions "as of the time of the relevant state-court

15  decision").  However, federal circuit law may still be persuasive authority in identifying

16  "clearly established" Supreme Court law or in deciding when a state court unreasonably

17  applied Supreme Court law.  See Van Tran v. Lindsey, 212 F.3d 1143, 1154 (9th Cir.),

18  cert. denied, 531 U.S. 944 (2000), overruled on other grounds by Lockyer v. Andrade,

19  538 U.S. 63, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003).

20  Although a particular state court decision may be both "contrary to" and "an

21  unreasonable application of" controlling Supreme Court law, the two phrases have

22  distinct meanings. Williams, supra, 529 U.S. at 391, 413.  A state court decision is

23  "contrary to" clearly established federal law if the decision applies a rule that contradicts

24  the governing Supreme Court law or reaches a result that differs from a result the

25  Supreme Court reached on "materially indistinguishable" facts. Early v. Packer, 537

26  U.S. 3, 8, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002) (per curiam); Williams, supra, 529 U.S.

27  at 405-06.  When a state court decision adjudicating a claim is contrary to controlling

28  Supreme Court law, the reviewing federal habeas court is "unconstrained by

4

§ 2254(d)(1)." Williams, supra, 529 U.S. at 406.  However, the state court need not cite the controlling Supreme Court cases, "so long as neither the reasoning nor the result of the state-court decision contradicts them." Early, supra.

A state court decision involves an "unreasonable application" of clearly established federal law if "the state court identifies the correct governing legal principle from [Supreme Court] decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, supra, 529 U.S. at 413; Woodford v. Visciotti, 537 U.S. 19, 24-27, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002) (per curiam).  A federal habeas court may not overrule a state court decision based on the federal court's independent determination that the state court's application of governing law was incorrect, erroneous or even "clear error." Lockyer, supra, 538 U.S. at 75.  Rather, a decision may be rejected only if the state court's application of Supreme Court law was "objectively unreasonable." Id.; Woodford, supra; Williams, supra.

When the state court has not provided a reasoned explanation for its denial of the petitioner's claims, a federal court has no basis other than the record for knowing whether the state court correctly identified the governing legal principle or was extending the principle into a new context. See Delgado v. Lewis, 223 F.3d 976, 981-82 (9th Cir. 2000).  Thus, "[f]ederal habeas review is not de novo when the state court does not supply reasoning for its decision, but an independent review of the record is required to determine whether the state court clearly erred in its application of controlling federal law. . . . Only by that examination may we determine whether the state court's decision was objectively reasonable." Id. at 982.

The same standard of objective unreasonableness applies where the petitioner is challenging the state court's factual findings under 28 U.S.C. § 2254(d)(2).  See Buckley v. Terhune, 397 F.3d 1149, 1154 (9th Cir. 2005), aff'd en banc, 411 F.3d 688 (9th Cir. 2006), cert. denied, 127 S.Ct. 2094 (2007); Bruce v. Terhune, 376 F.3d 950, 954 (9th Cir. 2004); Taylor v. Maddox, 366 F.3d 992, 999 (9th Cir.), cert. denied, 543 U.S. 1038 (2004); Torres v. Prunty, 223 F.3d 1103, 1107-08 (9th Cir. 2000).  A federal court first

must undertake an "intrinsic review" of the state court's factfinding, which requires an examination of the state court's factfinding process and not its findings. <u>Buckley</u>, <u>supra</u>, 397 F.3d at 1154-55; <u>Taylor</u>, <u>supra</u>, 366 F.3d at 1000. "Intrinsic challenges to state-court findings pursuant to the 'unreasonable determination' standard come in several flavors, each presenting its own peculiar set of considerations." <u>Taylor</u>, <u>supra</u>, 366 F.3d at 1000-01 (listing, e.g.: "where the state court should have made a finding of fact but neglected to do so[;] ... where the state court does make factual findings, but does so under a misapprehension as to the correct legal standard[;] ... and, where the fact-finding process itself is defective."). If the state court's factfinding process survives the federal court's intrinsic review, or if the petitioner does not challenge the state court's factfinding process, the state court's factual findings are presumed correct unless rebutted by clear and convincing evidence. <u>Buckley</u>, <u>supra</u>, 397 F.3d at 1155.

## V. <u>DISCUSSION</u>

Petitioner contends that the admission of his involuntary statements to the police violated his federal constitutional rights. (Petition at 5). Petitioner argues that the police coerced him to confess through promises of leniency. (Petition at 5). Specifically, petitioner contends that the police detectives promised that they would not increase his bail and would not charge him with additional counts of receiving stolen property if petitioner cooperated. (Petition at 5, Traverse at 3).

### A.   <u>The record below</u>

Prior to trial, petitioner moved to suppress his statements to Detectives Jay Stayner and Dan Leary on the grounds that (a) he did not knowingly and intelligently waive his <u>Miranda</u> rights, and (b) his statements were involuntary because they were coerced by promises of leniency. (1 CT 116-26). The trial court held a hearing on the admissibility of petitioner's statements. The trial court viewed videotapes and transcripts of a November 5, 2003 interview with petitioner by Detectives Stayner and Leary, viewed a transcript of a November 14, 2003 telephone conversation between Detective Stayner

1   and petitioner, and heard testimony from Detective Stayner. (1 CT 141-223, 224-71,

2   272-80, 1 RT 22-55).

3                    1.      The November 5, 2003 interview

4          Detectives Stayner and Leary interviewed petitioner on November 5, 2003. (1 CT

5   141). At the beginning of the interview, petitioner requested that he speak with

6   Detective Stayner alone. (1 CT 141). After he was advised of his <u>Miranda</u> rights,

7   petitioner asserted that he still wanted to speak with Detective Stayner. (1 CT 142).

8   Detective Leary subsequently left the interview room. (1 CT 142-43).

9          Immediately thereafter, petitioner stated that he knew he was facing a long prison

10  term and asked if Detective Stayner "could work" with him. (1 CT 143). Petitioner told

11  Detective Stayner that petitioner could provide information about "dope places" in return

12  for getting "something dropped." (1 CT 143). Detective Stayner answered that any deal

13  involving "drug places" would be up to the "narcotics guys." (1 CT 145). Detective

14  Stayner emphasized that his only concern was "residential burglaries" at this point in

15  time. (1 CT 145).

16         Petitioner then began asking questions about his bail. (1 CT 145). Detective

17  Stayner indicated that he had some control over the amount of bail in that he could seek

18  a bail enhancement. (1 CT 146). Petitioner responded to Detective Stayner, "Please

19  don't do that to me I mean, I'm not going anywhere you know I've been living there for

20  a year I'm not a security risk you know." (1 CT 146). After answering several questions

21  about his criminal record, petitioner asked, "So you will work with me at that, try to have

22  my bail, I mean not so high?" (1 CT 146-48). Detective Stayner indicated that he would

23  work with petitioner unless petitioner was not truthful in his answers. (1 CT 148).

24         Before asking any further questions, Detective Stayner asked petitioner whether he

25  wanted a drink. (1 CT 148). Petitioner replied that he did not want one and then asked if

26  he could make a phone call. (1 CT 148). Detective Stayner responded, "How about

27  after?" (1 CT 148). Petitioner replied, "Yeah that's fine." (1 CT 148).

28         Detective Stayner then began questioning petitioner about burglaries in the city of

                                                7

1    Corona.[3] (1 CT 148-49).  Petitioner denied knowing anything about such crimes and

2    explained how he had previously worked as a police informant for narcotics cases.  (1

3    CT 150-54).  Detective Stayner focused petitioner's attention back to the Corona

4    burglaries by stating, "You say your [sic] real interested in helping yourself, you'd do

5    anything to help yourself, . . . so you wouldn't have to serves [sic] so much time maybe,

6    or get your bail so its [sic] not so high or whatever.  Like I said before I can't promise

7    you anything, would be, even be wiling [sic] to, for your own sake, give up the people

8    that you were with when you did these burglaries?"  (1 CT 154-55).

9          Petitioner responded that he committed the burglaries by himself.  (1 CT 155).

10   Detectives Stayner and Leary told petitioner that they did not believe him and informed

11   him that there was evidence suggesting that other people were involved in the burglaries.

12   (1 CT 155-56).  Petitioner then responded, "Okay now if I do this, I mean what is it

13   gonna, I mean what, what are you gonna do for me?  I mean you already you know . . . ."

14   (1 CT 156).  The detectives replied that they had no control over what charges would be

15   filed against petitioner but that bail enhancement was within their discretion.  (1 CT 156-

16   57).

17         The detectives notified petitioner that they had evidence linking him to at least two

18   burglaries.  (1 CT 159-61).  Petitioner then asked, "Okay so if I be [sic] cooperative

19   would you, how many charges, what are you, how many burglaries you gonna charge me

20   with?"  (1 CT 161).  Detective Stayner indicated that petitioner would be charged with

21   "two for sure" and admitted that petitioner would also be charged with being a felon in

22   possession of a firearm.  (1 CT 162).  Detective Stayner then asked petitioner how many

23   burglaries he had been involved in, and petitioner answered, "About seven."  (1 CT 162).

24         Thereafter, the detectives asked petitioner about the details of the burglaries.[4]  (1

25   _____

26        [3]      At this time, Detective Leary returned to the interview room.  (1 CT 149).

27        [4]      Petitioner also stated that he was a day shy of his 42nd birthday.  (1 CT
     164).  In addition, petitioner answered questions regarding the firearms found in his

28                                                                                    (continued...)

1    CT 163-64, 168-228).  Petitioner eventually identified a man named Frank from Moreno

2    Valley as his co-participant in the burglaries.  (1 CT 227).  After Detective Stayner stated

3    that he would not seek a bail enhancement, petitioner revealed Frank's last name –

4    Bouliar – and provided a description of Frank.  (1 CT 228-33).  Detective Stayner again

5    questioned petitioner regarding the number of burglaries he had committed.  (1 CT 233).

6    This time, petitioner admitted to "about 12" burglaries over the three years since he had

7    been out of prison.  (1 CT 233).

8         Detective Stayner then told petitioner that, if he got out on bail he should contact

9    the detective to see "what the narc boys want to do."  (1 CT 234).  Detective Stayner

10   noted that the "narc boys" would be interested in working with petitioner and that they

11   would insist on "some type of contract" whereby petitioner "gives us so much and they

12   make this go away."  (1 CT 235).  Detective Stayner then added:

13            But that's really are [sic] locked in.  Man, you're really locked in, and

14            I can't guarantee that'll happen, you know?  If it was me, I was working

15            dope, I'd be interested . . . .  But ah, we are, I personally am only gonna

16            charge you with these three burglaries, okay?  I know you said you

17            committed others, other places here in Corona . . . .  [B]ut I can tell you right

18            now, just from what you told me, when the DA sees it he's gonna charge

19            you with the three. . . . Cause they're all about numbers.  They like numbers

20            as far as their conviction rates.  That's what they live for, hey I got a 95%

21            conviction rate, and when they get more, when they [have] more cases on

22            somebody they got more to deal with.  Maybe they'll deal it down to one

23            count, if you say hey lets make a deal, get your attorney, that's up to you

24            and your attorney.  But that happens before too, you probably done that

25            before you made a deal and they make things go away.  But I can't make

26

27            _____

28        [4] (...continued)
     house.  (1 CT 200-14).

1    them go away, only the DA can through plea-bargaining.  I'm not gonna

2    charge you with any other burglaries that I find out about, further you tell

3    me about.  This is a new one three [sic], the reason why?  I know for a fact

4    the DA's gonna file these three, simply because of the evidence.  That's

5    what, the evidence we had when we went to the judge to get the warrant, not

6    so much on the first one other than the victim i.d.-ing you and now we

7    verify it though [sic] your story that yeah that was you . . . .

8    (1 CT 235-36).

9        Petitioner asked if Detective Stayner could give him a break on one of the

10   burglaries because he did not go inside the house.  (1 CT 236).  Detective Stayner

11   explained that even if he did not include that crime as one of the charges, he would have

12   to include it in his report, and the district attorney would file charges on that crime

13   because it is in the report.  (1 CT 236).

14       Detective Stayner then asked if petitioner would be willing to talk about some of

15   the other burglaries he had been involved in because the detective wanted to "clear 'em,

16   especially if you have some of the property."  (1 CT 236).  A discussion ensued about the

17   property recovered from petitioner's house.  (1 CT 237-42).  Petitioner again asked about

18   the number of charges he was facing.  (1 CT 242).  Detective Stayner confirmed that he

19   would charge petitioner with four charges – two counts of burglary, one count of

20   possession of stolen property, and one count of possession of a firearm.  (1 CT 242-43).

21   Detective Stayner reminded petitioner that the district attorney would probably file three

22   burglary counts, along with the possession charges.  (1 CT 243).  The detectives then left

23   the interview room so that petitioner could make several phone calls.  (1 CT 243-46).

24       When the detectives returned to the interview room, they asked petitioner for

25   information on a "third guy" who was involved in the burglaries.  (1 CT 247).  Petitioner

26   asserted that the "third guy" was Frank Leon.  (1 CT 247-48).  Petitioner confirmed that

27   he could identify Mr. Leon's house but asked, "[S]ince I done [sic] that, ah, are you guys

28   gonna be straight up with me about trying to help me you know like far as . . . ."  (1 CT

1  249).  The detectives responded that they would only charge one count of receiving

2  stolen property regardless of the number of victims involved.  (1 CT 249-50).

3       Detective Stayner also confirmed that bail would be $25,000.  (1 CT 252-53).  He

4  reminded petitioner that "it could be worse [if] you had the bail enhancement."  (1 CT

5  253).  The detective reminded petitioner to contact him after petitioner bailed out to

6  determine how he could work with the detectives from the narcotics division.  (1 CT

7  253).

8

9            2.    The November 14, 2003 phone call

10      On November 14, 2003, while petitioner was released on bail, Detective Stayner

11  telephoned petitioner to tell him that the district attorney was filing the charges that the

12  detective had already discussed.  (1 CT 272).  He also told petitioner that he had spoken

13  with the district attorney about petitioner's cooperation, but that the district attorney

14  would not agree to any deals with petitioner and was going to charge petitioner as a

15  career criminal.  (1 CT 272-73).  Detective Stayner added that petitioner was "under no

16  obligation to do anything else for us, ah, voluntary or otherwise."  (1 CT 273).  He

17  reminded petitioner that he had not promised petitioner anything and that he had told

18  petitioner that any leniency would be "strictly up to the DA."  (1 CT 273).  After

19  emphasizing that petitioner had no obligation to cooperate, Detective Stayner

20  commented that he would still like to "clear up some more burglaries."  (1 CT 273).

21      Detective Stayner then asked petitioner, "Were you under [the] impression at any

22  time that I was making any promises to you at any time as far as any leniency or time

23  shaved off or anything like that?"  (1 CT 274).  Petitioner responded, "Yeah, it kind of

24  felt that way."  (1 CT 274).  Detective Stayner then asked, "In what way?"  (1 CT 274).

25  Petitioner replied, "I don't know it just felt that maybe I could get some help, you know,

26  from you guys."  (1 CT 274).  Detective Stayner asked, "Yeah, well, what exactly did I

27  promise you?"  (1 CT 274).  Petitioner answered, "Nothing."  (1 CT 274).

28      Detective Stayner explained that he had told the district attorney that petitioner

11

had cooperated without promises of leniency and that petitioner was doing everything he could in order to make up for his wrongdoings. (1 CT 275). Detective Stayner asked if this was petitioner's understanding of the situation and petitioner replied, "Yeah. Career criminal." (1 CT 275).

### 3.   Testimony of Detective Stayner

At the suppression hearing, Detective Stayner testified to the following. Petitioner was arrested on November 5, 2003, pursuant to the execution of a search warrant on petitioner's house. (1 RT 24-25). While at the police station following his arrest, petitioner asked to speak with an investigator. (1 RT 26). Petitioner was read and waived his <u>Miranda</u> rights, and requested that he speak with Detective Stayner alone. (1 RT 26-27). Detective Stayner's partner, Detective Leary, complied with petitioner's request and left the room. (1 RT 27).

Detective Stayner promised petitioner that if petitioner confessed, the detective would talk to the district attorney regarding petitioner's cooperation. (1 RT 28). Detective Stayner stressed that he never made any promises of leniency. (1 RT 28-29). Any statement regarding bail enhancement was not a negotiating tactic. (1 RT 42-43). It was meant to be a "shock factor" so that petitioner would tell the truth. (1 RT 50-51). Detective Stayner had no intention of raising the bail amount. (1 RT 44-45). Detective Stayner admitted that he was "possibly not" honest with petitioner about increasing his bail if he did not cooperate. (1 RT 45).

After his release on bail, petitioner contacted Detective Stayner on November 11, 2003, and offered to work with the detective in order to clear his name and show the district attorney that he was cooperative. (1 RT 30). Petitioner came to the police station out of his own initiative. (1 RT 31). Petitioner then drove with Detective Stayner and identified ten houses that he had burglarized. (1 RT 31-32).

On November 14, 2003, Detective Stayner contacted petitioner at home to clarify petitioner's understanding that he was not being offered leniency in exchange for his

1    cooperation. (1 RT 33-34). Petitioner expressed his understanding that Detective

2    Stayner never promised any leniency. (1 RT 34). Detective Stayner told petitioner that

3    he would appreciate petitioner's further cooperation but that he did not expect petitioner

4    to do so because petitioner was going to be charged as a career criminal. (1 RT 34-35).

5          On November 18, 2003, petitioner again contacted Detective Stayner and

6    expressed his willingness to identify additional houses that he burglarized. (1 RT 35).

7    Petitioner stated that he wanted to do the right thing and to do everything that he could to

8    help himself. (1 RT 35). Petitioner came to the police station out of his own volition. (1

9    RT 36). Petitioner then drove with Detective Stayner and identified two additional

10   houses that he burglarized. (1 RT 36-37).

11

12                      4.    The Trial Court's Ruling

13         The trial court found that the detectives implicitly promised to not seek a higher

14   bail amount and to not stack charges if petitioner cooperated. (1 RT 63). The trial court

15   determined that these promises constituted improper coercion. (1 RT 63). The trial

16   court noted, however, that petitioner was a "very knowledgeable defendant" who had

17   previously been in state prison and had been arrested numerous times. (1 RT 63). The

18   trial court further noted that the videotape of his interview showed that petitioner

19   "thought he could beat the system by offering to cooperate and that he would have done

20   that regardless of whether or not these threats of increased bail or not stacking would

21   have occurred." (1 RT 63). The trial court concluded that, based on the totality of the

22   circumstances, the detectives' promises were not the motivating cause of petitioner's

23   confession. (1 RT 64, 67-68). Therefore, petitioner's statements were voluntary and

24   admissible. (1 RT 64, 67-68).

25

26   **B.    Legal Authority**

27         In an ordinary habeas petition, the petitioner carries the burden of proving by a

28   preponderance of the evidence that his detention violates fundamental liberties

13

safeguarded against state action by the Constitution of the United States.  See McKenzie
v. McCormick, 27 F.3d 1415, 1418-19 (9th Cir. 1994) (citing inter alia Johnson v.
Zerbst, 304 U.S. 458, 469, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938)), cert. denied, 513 U.S.
1118 (1995).  However, in a petition for writ of habeas corpus challenging a state
conviction on the ground that the conviction is based upon an involuntary confession,
the burden of proof is on the state and it must be carried by a preponderance of the
evidence.  See Collazo v. Estelle, 940 F.2d 411, 420 (9th Cir. 1991) (citing Lego v.
Twomey, 404 U.S. 477, 489, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972)), cert. denied, 502
U.S. 1031 (1992).

        To determine the voluntariness of a confession, the test is whether, considering the
totality of the circumstances, the government obtained the statement by physical or
psychological coercion or by improper inducement so that the suspect's will was
overborne.  Derrick v. Peterson, 924 F.2d 813, 817 (9th Cir.), cert. denied, 502 U.S. 853
(1991); see also Colorado v. Connelly, 479 U.S. 157, 167, 107 S.Ct. 515, 93 L.Ed.2d 473
(1986) (holding that "coercive police activity is a necessary predicate to the finding that
a confession is not 'voluntary'"); Mincey v. Arizona, 437 U.S. 385, 396-402, 98 S.Ct.
2408, 57 L.Ed.2d 290 (1978).  The court must determine whether the confession is the
product of an essentially free and unconstrained choice by its maker.  Schneckloth v.
Bustamonte, 412 U.S. 218, 225, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).  If the will of the
maker of the confession has been overborne and his capacity for self-determination
critically impaired, the use of the confession offends due process.  Id. at 225-26.  The
court must assess the totality of the circumstances, both the characteristics of the accused
and the details of the interrogation.  Id. at 226.  Factors considered by the court may
include the youth of the accused, the lack of any advice to the accused of his
constitutional rights, the length of the detention, the repeated and prolonged nature of the
questioning, and the use of physical punishment such as the deprivation of food or sleep.
Id.  The court should determine the factual circumstances surrounding the confession,
assess the psychological impact on the accused, and evaluate the legal significance of

14

1   how the accused reacted.  Id.

2

3       **C.    California Court of Appeal Opinion**

4           On direct appeal, petitioner challenged the trial court's admission of evidence of

5   petitioner's statements to the police.  (Lodgment No. 7 at 29-42).  In rejecting

6   petitioner's claim, the California Court of Appeal reasoned as follows:

7               The pertinent legal principles are well settled.  To be admissible in

8           evidence, a defendant's confession must be voluntary.  The People bear the

9           burden of proving voluntariness by a preponderance of the evidence.

10          (People v. Vasila (1995) 38 Cal.App.4th 865, 873.)  Because the pertinent

11          facts in this case are undisputed, we independently review them to

12          determine whether defendant's confession was coerced and, therefore,

13          involuntary.  (People v. Boyer (1989) 48 Cal.3d 247, 263; People v. Mickey

14          (1991) 54 Cal.3d 612, 649; People v. Benson (1990) 52 Cal.3d 754, 779.)

15              "A confession is involuntary under the federal [citation] and state

16          [citation] guaranties of due process when it 'was "'extracted by any sort of

17          threats or violence, [or] obtained by any direct or implied promises,

18          however slight, [or] by the exertion of any improper influence[ ]'"'

19          [citation].  [Citation.]"  (People v. Benson, supra, 52 Cal.3d at p. 778.)  "A

20          confession is 'obtained' by a promise within the proscription of both the

21          federal and state due process guaranties if and only if inducement and

22          statement are linked, as it were, by 'proximate' causation."  (Ibid.)  Stated

23          differently, a confession is obtained by an inducement, in this case a

24          promise of leniency, if that inducement "is a motivating cause of the

25          decision to confess."  (People v. Boyde (1988) 46 Cal.3d 212, 238.)  In

26          deciding whether a confession is involuntary "courts examine 'all the

27          surrounding circumstances – both the characteristics of the accused and the

28          details of the interrogation.'  [Citations.]"  (In re Shawn D. (1993) 20

                                      15

1   Cal.App.4th 200, 208-209, italics omitted.)  The relevant characteristics

2   "include the accused's age, sophistication, prior experience with the

3   criminal justice system and emotional state."  (Id. at p. 209.)

4          In this case, the trial court found, and the parties concede, that the

5   police officers who questioned defendant made promises of leniency,

6   namely, that they would not seek a bail enhancement so that defendant's

7   bail would be the standard amount for the crime ($25,000) rather than the

8   enhanced amount (approximately $100,000) which would give defendant

9   the opportunity to make bail.  In addition, the officers represented to

10  defendant that they would not "stack" the receiving stolen property charges

11  if defendant cooperated.  Because there is no dispute whether the police

12  officers made promises of leniency, the issue we must resolve in this appeal

13  is whether the trial court correctly concluded that the promises were not a

14  motivating factor in defendant's decision to confess.  Again, we

15  independently review that issue.

16         We are persuaded from our review of the record that the trial court

17  correctly found that the officers' promises of leniency were not the

18  motivating factor behind defendant's decision to admit his complicity in the

19  crimes.  The circumstances surrounding the interrogation include the fact

20  that defendant, who was 42 years old at the time, initiated the conversation

21  after he was arrested.  Defendant clearly was interested in making a deal as

22  evidenced by his request to talk to Detective Stayner alone to find out if the

23  detective "could work" with defendant because defendant believed he was

24  "facing a lot of time right now."

25         Defendant, by his own admission, had served time in prison and had

26  at least one prior conviction for a serious or violent crime within the

27  meaning of the three strikes law at the time of his arrest in this case.

28  Defendant was not naive about or inexperienced in the criminal justice

16

1   system.  The transcript of the initial interview reveals that before defendant

2   acknowledged any of the burglaries he first determined what the officers

3   knew about defendant's involvement.  Defendant's demeanor, as depicted in

4   the videotape of the interview, is calm despite his concern over the amount

5   of time he believed he was facing in prison.

6        We are persuaded from our review of the record that defendant

7   intended to talk and admit his participation in the crimes once he determined

8   whether the officers already had information connecting him to the crimes.

9   By cooperating, defendant hoped to gain benefits for himself.  Defendant's

10  confessions were motivated by his desire to obtain the best deal he could in

11  light of the evidence the officers had recovered that connected defendant to

12  the various crimes.  In short, we conclude that the officers' promises of

13  leniency were not the motivating factor, and that defendant's confessions

14  were voluntary.

15  (Lodgment No. 10 at 7-10).

16

17       **D.     Findings and Conclusion**

18       The trial court's and the California Court of Appeal's findings that petitioner's

19  statements were voluntary are not entitled to a presumption of correctness under 28

20  U.S.C. § 2254(e)(1).  See Miller v. Fenton, 474 U.S. 104, 112, 106 S.Ct. 445, 88 L.Ed.2d

21  405 (1985) ("[T]he ultimate question whether, under the totality of the circumstances,

22  the challenged confession was obtained in a manner compatible with the requirements of

23  the Constitution is a matter of independent federal determination.").  On the other hand,

24  the trial court's and the California Court of Appeal's factual determinations underlying

25  the voluntariness issue are entitled to a presumption of correctness.  See Miller, supra;

26  Derrick v. Peterson, supra.

27       The California courts' finding that the detectives made promises of leniency – i.e.,

28  not to seek a bail enhancement and not to stack the receiving stolen property charges – is

1   a factual conclusion, which is entitled to a presumption of correctness. See Miller,

2   supra. However, the mere existence of promises does not render the confession

3   involuntary. The test is whether petitioner's will has been overborne and his capacity for

4   self-determination critically impaired. See Schneckloth, 412 U.S. at 225-26.

5       Here, the Court is unable to disagree with either the trial court's reasoning and

6   conclusion or the California Court of Appeal's reasoning and conclusion. As the

7   California courts noted, at the time of the interview, petitioner, who was 42 years old,

8   had prior experience with the criminal justice system. Moreover, there was no evidence

9   that petitioner had a mental impairment[5] or that he was deprived of sleep[6] or water.[7]

10  Furthermore, petitioner appeared calm during the interview, which lasted less than three

11  hours.[8] Nothing in the record suggests that petitioner was unduly susceptible to police

12  pressure.

13      Indeed, the record shows that petitioner initiated the conversation with Detective

14  Stayner. Petitioner wanted to know if the detective "could work" with him because

15  petitioner feared that he was going to receive a lengthy prison sentence. As discussed by

16  the California courts, petitioner cooperated with the detectives in hopes of obtaining the

17  best deal he could in light of the evidence the detectives had against him. The

18  detectives' promises of leniency had minimal, if any, effect on petitioner's decision to

19  confess. Notably, petitioner, after his release on bail, came to the police station twice,

20  out of his own initiative, to help identify the houses that he burglarized. Considering the

21  totality of the circumstances, the Court cannot conclude that petitioner's will was

22  overborne and his capacity for self-determination critically impaired by the detectives'

23  

24      [5]    Petitioner appears to have at least a high school education. (1 CT 164-65).

25      [6]    Detective Stayner executed the search warrant, which led to petitioner's
26  arrest, at about 10:30 a.m. (2 RT 577-78). The interview was conducted later that day at about 4:45 p.m. (2 RT 585).

27      [7]    During the interview, petitioner was offered a beverage. (1 CT 148).

28      [8]    The interview lasted two to three hours. (1 CT 270, 1 RT 29, 2 RT 585).

1  promises of leniency.  See Schneckloth, 412 U.S. at 225-26.

2  Accordingly, the Court finds that the California courts' rejection of petitioner's

3  claim was neither contrary to, nor involved an unreasonable application of, clearly

4  established federal law, as determined by the United States Supreme Court.

5

6  ## VI.  RECOMMENDATION

7  For the reasons discussed above, it is recommended that the court issue an Order:

8  (1) approving and accepting this Report and Recommendation; (2) directing that

9  Judgment be entered dismissing the action with prejudice.

10  DATED:

11  1/7/08

12

13  STEPHEN J. HILLMAN
United States Magistrate Judge

14

15

16

17

18

19

20  NOTICE
Reports and Recommendations are not appealable to the Court of Appeals, but may be

21  subject to the right of any party to file Objections as provided in the Local Rules

22  Governing the Duties of the Magistrate Judges and review by the District Judge whose

23  initials appear in the docket number.  No Notice of Appeal pursuant to the Federal Rules
of Appellate Procedure should be filed until entry of the Judgment of the District Court.

24

25

26

27

28

19